**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

| | |
|---|---|
| THE AMERICAN HOSPITAL ASSOCIATION,<br>    800 Tenth Street, NW, Suite 400<br>    Washington, DC  20001; | ) <br> ) <br> ) <br> ) |
| BANNER HEALTH,<br>    1441 N. 12th St.<br>    Phoenix, AZ 85006; | ) <br> ) <br> ) <br> ) |
| MOUNT SINAI HOSPITAL,<br>    One Gustave L. Levy Place<br>    New York, NY 10029; | ) <br> ) <br> ) <br> ) |
| EINSTEIN HEALTHCARE NETWORK,<br>    5501 Old York Road<br>    Philadelphia, PA 19141; | ) <br> ) <br> ) <br> ) |
| WAKE FOREST BAPTIST MEDICAL<br>CENTER,<br>    1 Medical Center Boulevard<br>    Winston-Salem, NC 27103; | ) <br> ) <br> ) <br> ) |
| GREATER NEW YORK HOSPITAL<br>ASSOCIATION,<br>    555 West 57th Street, #1500<br>    New York, NY 10019; | )  Case No.  1:15-cv-747 <br> ) <br> ) <br> ) <br> ) |
| HEALTHCARE ASSOCIATION OF NEW<br>YORK STATE,<br>    One Empire Drive<br>    Rensselaer, NY 12144; | ) <br> ) <br> ) <br> ) |
| NEW JERSEY HOSPITAL ASSOCIATION,<br>    760 Alexander Road<br>    Princeton, NJ 08543-0001;  and | ) <br> ) <br> ) <br> ) |
| THE HOSPITAL & HEALTHSYSTEM<br>ASSOCIATION OF PENNSYLVANIA,<br>    4750 Lindle Road<br>    Harrisburg, PA 17111, | ) <br> ) <br> ) <br> ) <br> ) |
|                         Plaintiffs, | ) <br> ) |

---

```
                                              )
                                              )
SYLVIA MATHEWS BURWELL, in her                )
official capacity as Secretary of Health and  )
Human Services,                               )
        200 Independence Avenue, SW           )
        Washington, DC  20204,                )
                                              )
                        Defendant.            )
                                              )
                                              )
```

    v.

## **COMPLAINT**

Plaintiffs the American Hospital Association, Banner Health, Mount Sinai Hospital, Einstein Healthcare Network, Wake Forest University Baptist Medical Center, Greater New York Hospital Association, Healthcare Association of New York State, New Jersey Hospital Association, and The Hospital & Healthsystem Association of Pennsylvania, bring this action to challenge an unlawful reduction in Medicare payment rates to hospitals for inpatient services furnished in federal fiscal year (FFY) 2015.

That payment reduction is the result of a policy instituted by the Centers for Medicare & Medicaid Services (CMS) for FFY 2014 that Plaintiffs have challenged in this Court, and which has cost hospitals more than $200 million in Medicare reimbursement for that year alone. *See Am. Hosp. Ass'n et al. v. Burwell*, No. 1:14-cv-00607 (D.D.C. April 14, 2014), ECF No. 1, *consolidated with Shands Jacksonville Med. Ctr. et al. v. Burwell*, No. 1:14-cv-00263 (D.D.C. July 23, 2014) (minute order).  The Medicare payment rates CMS has adopted for FFY 2015 to reimburse our nation's hospitals for inpatient care incorporate the invalid reduction that CMS applied in FFY 2014.  Given the numerous violations of the Administrative Procedure Act (APA) and the Medicare Act from the prior year, it is equally arbitrary and capricious for CMS to base FFY 2015 payment rates on the unlawful FFY 2014 rates.  This action is harming the Plaintiff

hospitals, whose reimbursement rates already have suffered in FFY 2015 and will continue to suffer as a result.  And unless CMS is prevented from carrying forward that reduction year to year, the harm to hospitals across the country will increase year to year, costing our nations' hospitals over $1 billion in Medicare reimbursement in just the next five years.

## INTRODUCTION

1.     When a patient comes to a hospital for treatment, the attending physician must decide whether the patient should be admitted.  If the patient is admitted, he or she is treated on an "inpatient" basis; if not, he or she is treated on an "outpatient" basis.  There are differences between the two, but in some cases treatment for the same condition can be provided in either setting.  For example, a young, healthy patient may be a good candidate to have a particular surgery on an outpatient basis, while an older patient with a higher risk of complications should have the same surgery on an inpatient basis.

2.     Whether a patient is treated on an inpatient or an outpatient basis affects the amount of reimbursement a hospital receives.  Hospitals caring for Medicare patients on an inpatient basis submit bills for reimbursement under Medicare Part A, the hospital insurance program, which covers inpatient hospital services.  Hospitals caring for Medicare patients on an outpatient basis submit bills for reimbursement under Medicare Part B, the supplemental medical insurance program, which covers medical and other health services, including hospital outpatient services.  Part A and Part B are funded separately and utilize different formulae to calculate payment.

3.     Traditionally, the decision to admit a patient for inpatient (rather than outpatient) treatment has been committed to the expert judgment of the attending physician.  But in August

2013, the Secretary of Health and Human Services (HHS), acting through CMS, adopted new Part A payment rules for FFY 2014.

4.     In those rules, CMS adopted a time-based rule for who is an inpatient and who is not.  CMS instructed admitting physicians and Medicare review contractors that an inpatient admission is "generally appropriate" when the physician expects the patient to require a stay that crosses "two midnights"—that is, a stay where the patient was admitted prior to midnight and stayed in the hospital that night, the next day, and the next evening until at least midnight. Conversely, for hospital stays in which the physician expects the patient to require care for less than two midnights, hospital admission is "generally inappropriate."

5.     Using the new two-midnights rule as a fig leaf, CMS also cut the FFY 2014 payments hospitals received for treating Medicare patients.  CMS claimed—without setting forth its actuaries' reasoning or calculations—that the two-midnights rule and other related policy changes would result in a net *increase* in the number of inpatient hospital stays that Medicare covers under Part A.  And it claimed that the net increase would cost the Medicare program $220 million in FFY 2014.  CMS accordingly cut its payments to hospitals by that amount, which translated into a 0.2 percent decrease in the payment rates used to calculate Medicare reimbursement for each beneficiary discharge occurring on or after October 1, 2013 through September 30, 2014.

6.     CMS did not explain its calculations and analysis at all, rendering it impossible for hospitals to critique the actuaries' estimates.  And in fact, there was much to criticize:  CMS grossly *underestimated* the volume of encounters that would shift from inpatient to outpatient status under its two-midnights rule, and just as seriously *overestimated* the number of cases that would shift from outpatient to inpatient.

7.     In light of these and other defects, Plaintiffs brought suit to challenge the 0.2 percent payment cut under the APA and the Medicare Act and asked this Court to set it aside. Plaintiffs alleged that CMS's reliance on indefensible assumptions by its actuaries and its failure to explain those assumptions rendered the 0.2 percent payment cut arbitrary and capricious in violation of the APA.  Plaintiffs also alleged that CMS failed to comply with the notice and comment procedures required by the APA and failed to promulgate the 0.2 percent cut as a regulation as required by the Medicare Act and the APA.  Many other hospitals also brought independent challenges to the legality of the 0.2 percent cut, and eventually all of these cases, and Plaintiffs' suit, were consolidated into a single proceeding.  The parties' cross-motions for summary judgment remain pending.

8.     Now CMS has done it again.  It used the flawed FFY 2014 payment rates to calculate the rates for each inpatient hospital stay in FFY 2015, resulting in a still greater payment cut.  CMS took the FFY 2014 rates, updated them to reflect changes in the costs of providing inpatient care and then made several other adjustments as required to account for other program costs.  In other words, CMS built its past errors into the FFY 2015 reimbursement rates. It was arbitrary and capricious for CMS to impose the 0.2 percent cut on hospitals in FFY 2014, and it was just as arbitrary and capricious for CMS to use those flawed amounts as the basis for this year's calculations.

9.     This decision has practical ramifications for the Plaintiff hospitals.  Because the FFY 2015 rates are lower than they should be, they affect payment for all discharges occurring on or after October 1, 2014.  In fact, the Plaintiff hospitals estimate that over the course of just FFY 2015, their facilities alone will have lost nearly $2.5 million in Medicare reimbursement to which they are entitled.

10.    Plaintiffs already have asked the Court to declare the FFY 2014 payment rates invalid and to set them aside.  Plaintiffs sought expedited judicial review through the Provider Reimbursement Review Board (PRRB) as provided under the Medicare Act and now ask the Court to declare that the FFY 2015 payment rates (the standardized amount, hospital-specific rate, and capital rate) must be revised and the Plaintiffs reimbursed for the shortfall in payments they received for hospital discharges on or after October 1, 2014.  CMS cannot cut hospital payments by incorporating arbitrary and capricious payment cuts from the prior year.

## PARTIES

11.    Plaintiff the American Hospital Association (AHA) is a national not-for-profit organization that represents and serves nearly 5,000 hospitals, health care systems, and networks, plus 43,000 individual members.  Its mission is to advance the health of individuals and communities by leading, representing, and serving the hospitals, health systems, and other related organizations that are accountable to the community and committed to health improvement.  The AHA provides extensive education for health care leaders and is a source of valuable information and data on health care issues and trends.  It also ensures that members' perspectives and needs are heard and addressed in national health policy development, legislative and regulatory debates, and judicial matters.

12.    Plaintiff Banner Health is one of the nation's largest not-for-profit health care systems.  Based in Phoenix, Arizona, Banner Health delivers high-quality, efficient care at twenty-five hospitals and other health care facilities across seven states.  Sixteen of its acute care hospitals and one specialty heart hospital are affected by the challenged rules.  Among those acute care hospitals, three are "Sole Community Hospitals": Fairbanks Memorial Hospital (located in Fairbanks, Alaska), Sterling Regional MedCenter (in Sterling, Colorado), and Banner

Churchill Community Hospital (in Fallon, Nevada).  CMS recognizes certain hospitals as "Sole Community Hospitals" based on their rural location and distance from other hospitals.  These community hospitals fill an important medical need in their rural communities.  Fairbanks Memorial Hospital, for example, is designated as a Sole Community Hospital for a surrounding area that spans 250,000 square miles.  The specialty heart hospital, Banner Heart, is one of the largest free-standing heart hospitals in the nation, with 111 beds.

13.     Plaintiff Mount Sinai Hospital is a 1,171-bed, not-for-profit, tertiary-care teaching facility in New York City.  Mount Sinai Hospital is part of a large academic medical center that provides numerous specialty services on its campus, such as cardiology care and research at Mount Sinai Heart and pediatric care at the Kravis Children's Hospital at Mount Sinai.  It also serves as the teaching hospital to the Icahn School of Medicine at Mount Sinai, which trains some 550 medical students, 540 graduate students, and 598 post-doctoral research fellows each year.

14.     Plaintiff Einstein Healthcare Network ("Einstein") is a private, not-for-profit organization committed to providing compassionate, high-quality health care to the greater Philadelphia, Pennsylvania region.  Einstein operates several major facilities and many outpatient centers.  These include Einstein Medical Center, a tertiary-care teaching hospital with a Level One Trauma Center in Philadelphia, and Einstein Medical Center Montgomery, a new hospital that opened in 2012.

15.     Plaintiff Wake Forest University Baptist Medical Center ("Wake Forest") is a fully integrated, not-for-profit, academic medical center and health care delivery system.  It operates 885 acute care, rehabilitation, and psychiatric care beds as well as outpatient and community health clinics and information centers in Winston-Salem, North Carolina.  Wake

Forest also operates Lexington Medical Center, a facility with 94 acute-care beds in Lexington, North Carolina, and Davie Medical Center, which has 25 beds at facilities in Bermuda Run and Mocksville, North Carolina.

16.     Plaintiff Greater New York Hospital Association (GNYHA) is a regional, not-for-profit trade association that represents nearly 150 hospitals in New York, New Jersey, Connecticut, and Rhode Island.  GNYHA's core mission is to help hospitals deliver the finest patient care in the most cost-effective way.  To do so, GNYHA engages in a wide range of educational activities, such as helping its members implement safety initiatives and sharing information about health care finance, health insurance, and graduate medical education. GNYHA also educates policymakers and state and federal legislators on the complexities and constraints hospitals face in delivering care.

17.     Plaintiff Healthcare Association of New York State (HANYS) is a not-for-profit statewide organization that represents and advocates at the state and federal level on behalf of all New York State hospitals and health systems, across the continuum of care.  HANYS also provides its members with data and intelligence on health care policy and operations, and has created a Data Academy to provide training in the tactical and strategic application of health care data.

18.     Plaintiff New Jersey Hospital Association (NJHA) is New Jersey's oldest and largest not-for-profit trade association dedicated to hospitals and their patients.  NJHA represents nearly 400 healthcare organizations including hospitals, health systems, nursing homes, home health agencies, hospice providers, and healthcare-related business and educational institutions. NHJA provides extensive educational programming on diverse, substantive topics.  Through the NJHA Institute for Quality and Patient Safety, NHJA unites healthcare providers and engages

nationally renowned experts in collaborative efforts to improve healthcare quality. In 2010, NHJA's Institute was designated a "patient safety organization" by the U.S. Agency for Healthcare Research and Quality. Through the Health Research and Educational Trust of New Jersey, NJHA also develops research projects and educational initiatives to promote quality, affordable, and accessible healthcare and raises awareness about vital healthcare issues.

19. Plaintiff The Hospital & Healthsystem Association of Pennsylvania (HAP) is a statewide not-for-profit organization that advocates at the state and federal level for nearly 240 Pennsylvania acute and specialty care, primary care, subacute care, long-term care, home health, and hospice providers, as well as the patients and communities they serve. HAP provides services to the hospital community beyond traditional issue advocacy. The initiatives HAP offers include engaging health care professionals, public-private partnerships, relationship-building with others interested in improving health care, and strategic planning. For example, HAP develops resources to assist not-for-profit hospitals complete community health assessments; works with the Pennsylvania Department of Health to support and enhance emergency preparedness and response efforts across the state; and assists hospitals and stakeholders in implementing health information technology that will improve patient quality and reduce health care errors and costs.

20. Defendant Sylvia Mathews Burwell is the Secretary of HHS. In that capacity, she is responsible for the conduct and policies of HHS, including the conduct and policies of CMS. The Secretary is sued in her official capacity only.

## JURISDICTION AND VENUE

21. This action arises under the Medicare Act, Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395 *et seq*.

22.     This Court has jurisdiction over this action pursuant to 42 U.S.C. § 1395oo(f), which provides for judicial review of any final decision of the PRRB, or of any "reversal, affirmance, or modification by the Secretary" of a PRRB decision, and "which involves a question of law or regulations relevant to the matters in controversy whenever the Board determines . . . that it is without authority to decide the question[.]"  When the PRRB determines that it is without authority to decide such a question, providers are permitted to commence a civil action in federal district court "within sixty days of the date on which notification of such determination is received."  42 U.S.C. § 1395oo(f).

23.     This Court may issue a declaratory judgment pursuant to 28 U.S.C. §§ 2201–2202.

24.     Venue lies in this judicial district pursuant to 42 U.S.C. § 1395oo(f)(1).

## STATUTORY AND REGULATORY BACKGROUND

### A.     Medicare Act

25.     Title XVIII of the Social Security Act establishes a program of health insurance for the aged and disabled, commonly known as Medicare.  42 U.S.C. §§ 1395 *et seq*.  The Plaintiff hospitals qualify as providers under Title XVIII, also known as the Medicare Act.

26.     The Medicare program is divided into four parts, A through D.  Parts A and B are the only parts relevant to this proceeding.  Part A, the hospital insurance program, provides for reimbursement of inpatient hospital services.  42 U.S.C. §§ 1395c–1395i-5.  Part B, the supplemental medical insurance program, pays for various "medical and other health services" not covered by Part A, including physician services and hospital outpatient services.  *Id.* § 1395k(a); *id.* §§ 1395j–1395w-4j.  Thus, for an individual who receives a particular treatment on an outpatient basis, payment to the hospital may be made under Part B, while for an individual whose risk factors support providing the treatment on an inpatient basis, payment to the hospital may be made under Part A.

27.     The Plaintiff hospitals are reimbursed for the inpatient care they provide to Medicare beneficiaries based on a predetermined payment amount for each Medicare discharge that is calculated using a detailed formula prescribed by the Medicare Act and implemented by CMS.  *See generally* 42 U.S.C. § 1395ww(d),(g); 42 C.F.R. §§ 412.60, 412.64, 412.100-.374.

### B.     Payment Rates

28.     After a Medicare beneficiary is discharged from a hospital after an inpatient stay, the hospital receives Part A payment based on the Medicare Severity Diagnosis-Related Group (MS-DRG) corresponding to the beneficiary's clinical condition and treatment that was provided.  *See* 42 U.S.C. § 1395ww(d); 42 C.F.R. §§ 412.60, 412.64, 412.100-.374.

29.     The MS-DRG payment is based on two national base payment rates: a "standardized amount" for operating expenses (like staff wages and medical supplies) and a standard federal capital rate for capital expenses (such as the physical facility and equipment used to provide care).  Both rates are adjusted to account for the beneficiary's clinical condition and market conditions in the hospital's location.  *See* 42 U.S.C. § 1395ww(d),(g); 42 C.F.R. §§ 412.60, 412.64(c), 412.308, 412.312, 412.316.

30.     The operating portion of the per-discharge amount for Sole Community Hospitals (such as Plaintiffs Fairbanks Memorial Hospital, Sterling Regional MedCenter, and Banner Churchill Community Hospital) is calculated using either the national base payment amount or one of several "hospital-specific rates" pertaining to the hospital, whichever yields the greatest aggregate payment for the hospital's fiscal year.  *Id.* §§ 412.90(a), 412.92(d).

31.     The capital portion of the per-discharge amount for a new hospital, such as Einstein Medical Center Montgomery, is eighty-five percent of the hospital's allowable capital-related costs, rather than the standard federal capital rate.  *See id.* §§ 412.300(b), 412.304(c)(2).

32.     For certain hospitals, amounts are added to the MS-DRG payment amount and the capital payment amount to reflect the higher indirect patient care costs associated with teaching medical residents ("indirect medical education" or "IME" payments), *id.* §§ 412.105, 412.322, and the costs associated with treating a disproportionate share of low-income patients ("disproportionate share hospital" or "DSH" payments), *id.* §§ 412.106, 412.320.  IME and DSH payments are calculated by applying an adjustment factor to the standardized amount and adjusted federal capital rate.  *Id.* §§ 412.64, 412.105, 412.106, 412.312, 412.320, 412.322.

33.     To calculate the national standardized amount for operating expenses for a given fiscal year, CMS starts with the base rate from the prior fiscal year, removes several of the adjustments or offsets applied in that prior year, and then updates the previous rate by multiplying it by an "update factor" and several other adjustment factors.  *See* 42 U.S.C. § 1395ww(d)(3); Hospital Inpatient Prospective Payment Systems for Acute Care Hospitals and the Long-Term Care Hospital Prospective Payment System and Fiscal Year 2015 Rates, Table 1: Comparison of FY 2014 Standardized Amounts to the FY 2015 Standardized Amounts, 79 Fed. Reg. 49,854, 50,382-83 (Aug. 22, 2014); 79 Fed. Reg. at 59,681.

34.     For Sole Community Hospitals, the hospital-specific rate for a given fiscal year is updated from a dollar amount calculated in FFY 2012 dollars, using an overall "update factor" that combines a series of "update factors" as well as budget neutrality factors for prior fiscal years and other adjustment factors.  *See* CMS Transmittal No. 3128 (Nov. 26, 2014)[1]; CMS, FY

---

[1] *Available at* http://www.cms.gov/Regulations-and-Guidance/Guidance/Transmittals/Downloads/R3138CP.pdf.

2015 IPPS Final Rule Impact File, FY 2014 IPPS Final Rule Impact File, FY 2013 IPPS Final Rule Impact File.[2]

36. To calculate the standard federal capital rate for reimbursing a hospital's capital-related costs, CMS determines an "update" factor, combines that update factor with several other adjustment factors, and multiplies them by the previous fiscal year's federal capital rate to determine the new federal capital rate. *See* 79 Fed. Reg. at 50,389; *id.* at 59,682.

### D. History of the 0.2 Percent Payment Cut

36. On May 10, 2013, CMS published proposed rules governing Medicare payment policy under the inpatient prospective payment system (IPPS) for FFY 2014 (2014 Proposed Rule). Among other things, the 2014 Proposed Rule proposed to bring "additional clarity" to CMS's guidelines about when a Medicare beneficiary should be admitted to the hospital as an inpatient.

37. CMS has long recognized that the decision to admit a patient is a "complex medical judgment" that involves the consideration of many factors. CMS, Medicare Benefit Policy Manual (MBPM) Ch. 1 § 10. Historically, CMS has instructed practitioners to "use a 24-hour period as a benchmark, i.e., [physicians] should order admission for patients who are expected to need hospital care for 24 hours or more." *Id.* But in the 2014 Proposed Rule, CMS proposed to establish a presumption that admission is "generally appropriate" when the physician expects the patient to receive care in the hospital for a period spanning two midnights—i.e., more than 24 hours, and depending on the time the patient arrives at the hospital, in some cases nearly *48 hours*. Conversely, CMS wrote that hospital admission is "generally inappropriate" when the

---

[2] *Available at* http://www.cms.gov/Medicare/Medicare-Fee-for-Service-Payment/AcuteInpatientPPS/Acute-Inpatient-Files-for-Download.html (last visited May 19, 2015) (click to download Impact Files).

physician expects the patient to require care for less than two midnights.  Hospital Inpatient

Prospective Payment Systems for Acute Care Hospitals and the Long-Term Care Hospital

Prospective Payment System and Proposed Fiscal Year 2014 Rates, 78 Fed. Reg. 27,486, 27,648

(proposed May 10, 2013).

38.     As a result of these new policies, CMS predicted that Medicare would be required

to spend an additional $220 million to reimburse hospitals for those inpatient stays.  According

to CMS, its actuaries examined FFY 2009 through FFY 2011 Medicare claims data and

estimated that as a result of CMS's new policies, approximately 400,000 encounters would shift

from outpatient to inpatient and approximately 360,000 encounters would shift from inpatient to

outpatient, causing a net shift of 40,000 encounters to inpatient status.  *Id.* at 27,649.  CMS thus

proposed a 0.2 percent payment cut to offset this purported swell in inpatient admissions.  *Id.*

39.     CMS did not substantiate its prediction in the Proposed Rule.  Nor did it share its

actuaries' assumptions.

40.     After the 2014 Proposed Rule was published, hospitals and other commenters—

including many of the Plaintiffs here—asked CMS to explain how a policy that makes it *harder*

to justify inpatient treatment and requires an inpatient stay to last longer could result in *more*

inpatient cases.  Commenters also noted that CMS had not revealed its data, methodology, or

assumptions underlying the payment cut.  They asked CMS to reveal that information so they

could provide informed comments and critiques of CMS's analysis.

41.     CMS published the IPPS final rule in the Federal Register in August 2013 (2014

Final Rule).  It adopted, with few changes, the proposed policies described above, including the

0.2 percent reduction.  Hospital Inpatient Prospective Payment Systems for Acute Care Hospitals

and the Long-Term Care Hospital Prospective Payment System and Fiscal Year 2014 Rates, 78

Fed. Reg. at 50,496, 50,508 (Aug. 19, 2013).  It did not share its data, nor the support for its

actuaries' conclusions.  Indeed, in the 2014 Final Rule, CMS actually identified—but did not

explain—two significant limitations to its actuarial analysis.  CMS excluded an entire category

of cases from its estimate of the number of cases that would shift from inpatient to outpatient, yet

included a substantially similar category of cases to estimate the shift from outpatient to inpatient.

CMS also excluded another category of cases from its estimate of the shift from outpatient to

inpatient.

   **E.**   **Substantive Flaws in the 0.2 Percent Payment Cut**

   42.   Because CMS refused to share the basis for its actuaries' assumptions and

conclusions, hospitals seeking to challenge them are hampered by that total lack of transparency.

But on information and belief, CMS's actuarial assumptions were inherently flawed.

   43.   To begin, when CMS's actuaries estimated how many encounters would shift

from inpatient to outpatient, they examined only "claims containing a *surgical* MS-DRG.

Claims containing *medical* MS-DRGs were excluded."  78 Fed. Reg. at 50,953 (emphases

added).  In other words, CMS's calculations ignored *an entire category of cases*—medical cases

that do not involve a surgery, such as patients treated for pneumonia, seizures, or heart attacks.

   44.   There is no reason for CMS's actuaries to assume that medical cases would not

shift from the inpatient setting to the outpatient setting.  Because medical patients, unlike

surgical patients, often are hospitalized with symptoms that have not yet been diagnosed, it often

will be more difficult for physicians to definitively predict how long these patients will need to

be hospitalized.  Simple logic therefore suggests that medical cases are *more* likely to shift from

inpatient to outpatient—and that CMS undercounted the shifts in that direction by considering

only surgical cases in its modeling.

45.     Indeed, CMS's own statistics bear this logic out:  In FFY 2011, five *medical* MS-DRGs accounted for nearly 160,000 zero and one-day stays.  Many of these cases would be likely to shift from inpatient to outpatient under the new "two-midnights" policy.

46.     There are other compelling statistical indications that CMS undercounted the number of cases that will shift from inpatient to outpatient.

47.     According to statistics on the CMS website, for example, there were a total of 1,569,693 inpatient stays of one day or less in calendar year 2011.  That was a fairly typical number; according to CMS's data files, there are about one million zero- or one-midnight stay inpatient cases each year.

48.     Thus, CMS's new policies easily could lead to a net increase in *outpatient* cases, rather than a net increase in inpatient cases.  *See* Letter from Mark Polston, King & Spalding LLP, to Marilyn Tavenner, CMS Administrator 10 (June 25, 2013), http://www.regulations.gov/#!documentDetail;D=CMS-2013-0084-0450 (last visited May 19, 2015).

49.     CMS's analytical approach regarding the shift from outpatient to inpatient also is inherently flawed.

50.     We have explained that CMS's actuaries excluded medical MS-DRGs when examining the claims that would shift from inpatient to outpatient.  But CMS did not impose the same surgical-cases-only limitation when it assessed the reverse – how many encounters would shift from outpatient to inpatient.  *See* 78 Fed. Reg. at 50,953.  CMS thus *included* cases in the outpatient-to-inpatient count that were most similar to the types of cases that were categorically *excluded* from the inpatient-to-outpatient count.

51.     That disconnect is critical.  If CMS used a smaller bucket of cases when it counted the subset shifting from inpatient to outpatient than it did the subset shifting the other direction, then the underpinnings supporting the payment reduction collapse.

**F.     Procedural Flaws in the 0.2 Percent Payment Cut**

52.     CMS acknowledged in the 2014 Final Rule that multiple commenters had observed that "CMS actuaries' estimated increase in IPPS expenditures of $220 million was unsupported and insufficiently explained to allow for meaningful comment."  78 Fed. Reg. at 50,953.

53.     But having identified the problem, CMS declined to solve it; instead it rejected these comments and simply re-stated its bare-bones description of its actuaries' findings. Tellingly, however, CMS for the first time identified—but did not explain—the two major limitations on its actuarial analysis: (1) in analyzing the shift from outpatient to inpatient, it excluded claims not containing observation or a major procedure; and (2) in analyzing the shift from inpatient to outpatient, it excluded claims containing medical MS-DRGs.  *Id.*

54.     CMS's failure to include sufficient detail in the 2014 Proposed Rule precluded hospitals from engaging in any meaningful notice and comment process.

55.     The 0.2 percent payment cut also was invalid for another reason:  CMS did not promulgate the reduction as a "regulation," codified in the Code of Federal Regulations, as the Medicare Act expressly requires.  *See* 42 U.S.C. § 1395ww(d)(5)(I)(i).

56.     In light of all these defects, Plaintiffs challenged the validity of 2014 Final Rule as provided in 42 U.S.C. § 1395oo(f)(1),  by asking the PRRB to determine that it lacked the authority to decide the questions of law presented in their challenge and to grant expedited judicial review.  The PRRB granted their request.

57.     In April 2014, Plaintiffs filed suit in federal court, explaining that the 0.2 percent payment cut violated the APA and the Medicare Act and asking the Court to set it aside.  *Am. Hosp. Ass'n et al. v. Burwell*, No. 1:14-cv-00607 (D.D.C. April 14, 2014), ECF No. 1.  The parties' cross-motions for summary judgment remain pending.

**G.     The FFY 2015 IPPS Final Rule**

58.     While the parties were briefing their cross-motions on the 2014 Final Rule, CMS was busy proposing its FFY 2015 payment rules.

59.     In response to CMS's proposed payment rates for FFY 2015, the AHA again objected to the 0.2 percent reduction and to CMS's carrying forward all of the related deficiencies from the 2014 Final Rule.  Letter from Linda Fishman, Senior Vice President, Am. Hospital Ass'n, to Marilyn Tavenner, CMS Administrator 14 (June 26, 2014), *available at* http://www.aha.org/advocacy-issues/letter/2014/140626-cl-1607-p-ipps.pdf.

60.     CMS was undeterred.  In its 2015 Final Rule, CMS did not make any adjustments to the amounts it uses to calculate Medicare Part A payment (i.e., the standardized amount or hospital-specific rate for operating expenses and the standard federal capital rate) to eliminate the 0.2 percent cut it had applied to those amounts in FFY 2014.  79 Fed. Reg. at 50,381-82, 50,389; 79 Fed. Reg. at 59,681, 59,683.  Because the FFY 2015 standardized amount, hospital-specific rate, and federal capital rate are based on the FFY 2014 amounts, *see id.* at 59,681, 59,683; CMS Impact Files, *supra* at 13, the invalid 0.2 percent cut that CMS applied in FFY 2014 also affects the FFY 2015 standardized amount, hospital-specific rate, and standard federal capital rate.

61.     As a result, the 0.2 percent payment cut in FFY 2014 continues to flow through many different components of the Plaintiff hospitals' reimbursement under Medicare Part A for FFY 2015.

62.     Commenters pointedly observed that the deficiencies of the 2014 Final Rule infected the 2015 Rule.  But just as in 2014, CMS did not offer any explanation for continuing the effects of the 0.2 percent payment cut in the calculation of the FFY 2015 payment rates.  *See* 79 Fed. Reg. at 50,381-89.

## THE PLAINTIFFS HAVE SUFFERED HARM

63.     A payment cut of 0.2 percent might seem like small change.  But its cumulative effect across hospitals is significant.  In fact, the Plaintiff hospitals estimate that if CMS were to re-calculate the FFY 2015 rates without incorporating the 0.2 percent cut to the FFY 2014 standardized amount, hospital-specific rate, and federal capital rate, Plaintiffs' Medicare reimbursement for discharges of Medicare beneficiaries during FFY 2015—just for their facilities and just for that one year—would increase by nearly $2.5 million.

64.     CMS's inclusion of the 0.2 percent payment cut in its calculation of the FFY 2015 rates already has harmed—and continues to harm—each of the Plaintiff hospitals:

### Banner Health

65.     Banner Health estimates that over the course of FFY 2015, CMS's incorporation of the 0.2 percent cut into the FFY 2015 rates will mean a loss of more than $1,139,000 in Medicare reimbursement.

66.     On February 17, 2015, Banner Health requested a group hearing by the PRRB regarding the FFY 2015 rates.  The appeal was filed timely, within 180 days of the Secretary's publication of the standardized amount, hospital-specific rate, and federal capital rate used to calculate the FFY 2015 IPPS payment rates in the Federal Register on August 22, 2014, 79 Fed. Reg. at 49,854.

67.     Banner Health challenged the validity of the FFY 2015 rates because they reflect an unlawful and invalid 0.2 percent cut that CMS applied to the standardized amount, hospital-specific rate, and federal capital rate in FFY 2014.  It also requested expedited judicial review on the basis that while the PRRB had jurisdiction over the appeal, the only issue raised was a pure question of law that the PRRB lacked the authority to decide.  In addition, Banner Health sought a remedy—revision of the standardized amount, federal capital rate, and hospital-specific rates for FFY 2015 and additional reimbursement for the flow-through effects of the 0.2 percent payment cut for Medicare discharges occurring on or after October 1, 2014—that the Board lacked the power to grant.

68.     On March 20, 2015, Banner Health received notice that the PRRB granted its request for expedited judicial review.

69.     Banner Health thus has exhausted its administrative remedies.

**Mount Sinai Hospital**

70.     Mount Sinai Hospital estimates that over the course of FFY 2015, CMS's incorporation of the 0.2 percent cut into the FFY 2015 rates will mean a loss of more than $651,200 in Medicare reimbursement.

71.     On February 17, 2015, Mount Sinai Hospital requested an individual hearing by the PRRB regarding the FFY 2015 rates.  The appeal was filed timely, within 180 days of the Secretary's publication of the standardized amount, hospital-specific rate, and federal capital rate used to calculate the FFY 2015 IPPS payment rates in the Federal Register on August 22, 2014, 79 Fed. Reg. at 49,854.

72.     Mount Sinai Hospital challenged the validity of the FFY 2015 rates because they reflect an unlawful and invalid 0.2 percent cut that CMS applied to the standardized amount,

hospital-specific rate, and federal capital rate in FFY 2014.  Mount Sinai Hospital also requested expedited judicial review on the basis that while the PRRB had jurisdiction over the appeal, the only issue raised was a pure question of law that the PRRB lacked the authority to decide.  In addition, Mount Sinai Hospital sought a remedy—revision of the standardized amount and federal capital rate for FFY 2015 and additional reimbursement for the flow-through effects of the 0.2 percent payment cut on Medicare discharges occurring on or after October 1, 2014—that the Board lacked the power to grant.

73.      On March 20, 2015, Mount Sinai Hospital received notice that the PRRB granted its request for expedited judicial review.

74.      Mount Sinai Hospital thus has exhausted its administrative remedies.

**Einstein**

75.      Einstein estimates that over the course of FFY 2015, CMS's incorporation of the 0.2 percent cut into the FFY 2015 rates will mean a loss of more than $211,800 in Medicare reimbursement.

76.      On February 17, 2015, Einstein requested a group hearing by the PRRB regarding the FFY 2015 rates.  The appeal was filed timely, within 180 days of the Secretary's publication of the standardized amount, hospital-specific rate, and federal capital rate used to calculate the FFY 2015 IPPS payment rates in the Federal Register on August 22, 2014. 79 Fed. Reg. at 49,854.

77.      Einstein challenged the validity of the FFY 2015 rates because they reflect an unlawful and invalid 0.2 percent cut that CMS applied to the standardized amount, hospital-specific rate, and federal capital rate in FFY 2014.  It also requested expedited judicial review on the basis that while the PRRB had jurisdiction over the appeal, the only issue raised was a pure

question of law that the PRRB lacked the authority to decide.  In addition, Einstein sought a remedy—revision of the standardized amount and federal capital rate for FFY 2015 and additional reimbursement for the flow-through effects of the 0.2 percent payment cut for Medicare discharges on or after October 1, 2014—that the Board lacked the power to grant.

78.    On March 20, 2015, Einstein received notice that the PRRB granted its request for expedited judicial review.

79.    Einstein thus has exhausted its administrative remedies.

**Wake Forest**

80.    Wake Forest estimates that over the course of FFY 2015, CMS's incorporation of the 0.2 percent cut into the FFY 2015 rates will mean a loss of more than $468,880 in Medicare reimbursement.

81.    On February 17, 2015, Wake Forest requested a group hearing by the PRRB regarding the FFY 2015 rates.  The appeal was filed timely, within 180 days of the Secretary's publication of the standardized amount, hospital-specific rate, and federal capital rate used to calculate the FFY 2015 IPPS payment rates in the Federal Register on August 22, 2014, 79 Fed. Reg. at 49,854.

82.    Wake Forest challenged the validity of the FFY 2015 rates because they reflect an unlawful and invalid 0.2 percent cut that CMS applied to the standardized amount, hospital-specific rate, and federal capital rate in FFY 2014.  It also requested expedited judicial review on the basis that while the PRRB had jurisdiction over the appeal, the only issue raised was a pure question of law that the PRRB lacked the authority to decide.  In addition, Wake Forest sought a remedy—revision of the standardized amount and federal capital rate for FFY 2015 and additional reimbursement for the flow-through effects of the 0.2 percent payment cut for

Medicare discharges occurring on or after October 1, 2014—that the Board lacked the power to grant.

83.     On March 20, 2015, Wake Forest received notice that the PRRB granted its request for expedited judicial review.

84.     Wake Forest thus has exhausted its administrative remedies.

85.     The effects of the 0.2 percent payment cut on the FFY 2015 rates also have harmed and will continue to harm the AHA, NJHA, GNYHA, HANYS, HAP and their respective member hospitals.  Each of the hospital associations has been forced to devote significant time and money to respond to the new rates, thereby diverting resources from its educational activities.

86.     On June 26, 2014, the AHA submitted comments to CMS in response to the 2015 Proposed Rule on behalf of its members nationwide, including the Plaintiff hospitals.  It called for CMS to reverse the effects of the 0.2 percent cut.  Letter from Linda Fishman, Senior Vice President, Am. Hospital Ass'n, to Marilyn Tavenner, CMS Administrator 14 (June 26, 2014), *available at* http://www.aha.org/advocacy-issues/letter/2014/140626-cl-1607-p-ipps.pdf.  CMS did not acknowledge—much less address—that comment.  *See* 79 Fed. Reg. at 50,381-82, 50,389.

87.     Despite the objections raised by the AHA and many other hospitals and hospital associations that continue to suffer harm, CMS's FFY 2015 payment rates reflect the unlawful and invalid 0.2 percent payment cut.

## COUNT I

### VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT
**The CMS Policy Is Arbitrary and Capricious Because CMS Used Unlawful and Invalid FFY 2014 Rates to Determine the FFY 2015 Payment Rates**

88.     Plaintiffs reassert and incorporate by reference each of the above paragraphs.

89.     The APA prohibits the Secretary from implementing the Medicare Act via actions, findings, or conclusions that are arbitrary and capricious.  5 U.S.C. § 706(2)(A).

90.     The FFY 2015 payment rates incorporate the flawed, unlawful, and invalid 0.2 percent cut that CMS applied to the standardized amount, hospital-specific rate, and federal capital rate in FFY 2014.

91.     CMS incorporated the flawed and unlawful 0.2 percent cut to FFY 2015 rates without sufficient justification.

92.     CMS's decision to build erroneous rates into the FFY 2015 amounts renders the FFY 2015 rates arbitrary and capricious and thus invalid under the APA.

93.     CMS's failure to explain its decision to build erroneous rates into the FFY 2015 amounts renders the FFY 2015 rates arbitrary and capricious and thus invalid under the APA.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court issue judgment in its favor and against Defendant and issue the following relief:

A.     A declaratory judgment that CMS's decision to use the FFY 2014 amounts as the basis for calculating the FFY 2015 payment rates was arbitrary and capricious and thus violates the APA;

B.     An order declaring that the FFY 2015 standardized amount, hospital-specific rate, and federal capital rate must be revised;

C.     An order that Plaintiff hospitals be reimbursed for the shortfall in the payments they received for hospital discharges on or after October 1, 2014;

G.     An award of such other temporary and permanent relief as this Court may deem just and proper.

Dated:  May 19, 2015                    Respectfully submitted,


                                         /s/ Catherine E. Stetson
                                        Sheree R. Kanner (D.C. Bar No. 366926)
                                        Catherine E. Stetson* (D.C. Bar No. 453221)
                                        Margia K. Corner (D.C. Bar No. 1005246)
                                        Jennifer D. Brechbill (D.C. Bar No. 1011454)
                                        HOGAN LOVELLS US LLP
                                        555 Thirteenth Street, NW
                                        Washington, DC 20004
                                        (202) 637-5600

                                        Melinda Reid Hatton (D.C. Bar No. 419421)
                                        Lawrence Hughes (D.C. Bar. No. 460627)
                                        AMERICAN HOSPITAL ASSOCIATION
                                        800 Tenth Street, NW
                                        Two CityCenter, Suite 400
                                        Washington, DC 20001
                                        (202) 638-1100

                                        *Counsel of record